UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CITIZENS ALLIED FOR INTEGRITY AND ACCOUNTABILITY, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>THOMAS M. SCHULTZ, *et al.*,<br><br>Defendants. | Case No. 1:17-cv-00264-BLW<br><br>MEMORANDUM DECISION AND ORDER |

## INTRODUCTION

The Court has before it Plaintiffs' Motion for Partial Summary Judgment (Dkt. 23) and Defendants' Motion for Summary Judgment (Dkt. 24). The Court heard oral argument on July 19, 2018, and now issues the following decision.

## BACKGROUND[1]

Plaintiffs Charlene Quade and Rachael Holtry own residential property in Fruitland, Idaho. *Compl.* ¶¶ 3-4; *Ans.* ¶¶ 3-4. At various times in the years preceding this

---

[1] The following facts are undisputed and material to the resolution of the issues in this case. Though Defendants filed a Statement of Disputed Facts (Dkt. 31-1), the focus of the Statement is to complain that Plaintiffs' "Undisputed Material Facts" section (*Pl's Br.* at 4-15, Dkt. 23-1) allegedly "draw[s] inferences from and characterize the December 14, and 15, 2016 hearing transcript in ways that are inaccurate, argumentative, or result in purported legal conclusions." *Def's Statement of Disputed Material Facts* at 2, Dkt. 31-1. However, as Defendants note, "[t]he hearing transcript speaks for itself." *Id.* While the Court relied on some of the evidence underlying the "Undisputed Material Facts" section, it reviewed the evidence independently and drew its own conclusions. Any facts that Defendants characterize as disputed for other reasons were not relied on by the Court in reaching its conclusions.

action, each was contacted by representatives from oil and gas operator Alta Mesa about the possibility of leasing their mineral rights. *Quade Dep.* at 34:15-22, Dkt. 31-3; *Holtry Dep.* at 27:8-21, Dkt. 31-5. Alta Mesa was interested in leasing the mineral rights of landowners in the area because it wished to develop a pool of natural gas that it believed to be located under the landowners' properties. *Fugate Aff.* Ex. 1 at 2, Dkt. 24-4 ("Pepper Aff."). However, Plaintiffs Quade and Holtry determined that they were not interested in leasing and did not respond to Alta Mesa's further inquiries. *Quade Dep.* at 34:15-22, Dkt. 31-3; *Holtry Dep.* at 29:6-30:21, Dkt. 31-5.

On or around November 25, 2016, Plaintiffs Quade and Holtry received a mailing from the Idaho Department of Lands ("IDL"). *Compl.* ¶ 16; *Ans.* ¶ 16. This mailing included a redacted copy of an integration application filed by AM Idaho, LLC and Alta Mesa Services, LP (collectively, "Alta Mesa"), and it stated that a prehearing conference would be held on December 8 and a hearing would be held on December 14. *Durand Decl.* Ex. A at 22, Dkt. 23-3 ("Notice of Hearing"); *Def's Statement of Undisputed Facts* ¶ 1, Dkt. 24-2. It also stated that the deadline to respond or object to the integration application was December 7. *Id.* The integration application included a proposed joint operating agreement (JOA) and lease. *Fugate Aff.* Ex. 4 at 15, Dkt. 24-5 ("Director's Order").

If approved, Alta Mesa's integration application would force landowners who had not voluntarily leased their mineral rights to Alta Mesa, like Plaintiffs Quade and Holtry, to lease those rights for a set royalty percentage and bonus payment. *See* Idaho Code §

47-320. The Idaho Oil and Gas Conservation Act (OGCA) requires IDL to approve integration (also known as "forced pooling") of uncommitted landowners within a designated "spacing unit"[2] if an oil and gas operator obtains the consent of a minimum percentage of landowners whose land overlays the oil or gas deposit, if the operator's application includes all of the statutorily required elements (such as a description of the proposed spacing unit), and if the terms and conditions of the integration order are "just and reasonable."[3] *See id.* Landowners can choose one of three options that offer varying levels of participation, risk, and reward. *See id.* Under the final "option," landowners who do not voluntarily lease their mineral rights and select a participation option are "deemed leased." *Id.* The OGCA sets the royalty payment that "deemed leased" landowners receive at one-eighth,[4] and sets their bonus payment at the highest bonus payment paid by the operator prior to filing the application. *Id.*

---

[2] A spacing order "specif[ies] the size, shape and location" of land overlying a pool of hydrocarbons in order to ensure that each unit can be "efficiently and economically drained" by one well. Idaho Code § 47-318. Alta Mesa applied for both a spacing and an integration order, and the Director's Order, which was adopted by the Final Order, granted both. *Fugate Aff.* Ex. 4, Dkt. 24-5 ("Director's Order").

[3] The OGCA, codified at Idaho Code Title 47, Chapter 3, was amended in 2017. All references to the Act in this Order are to the current version of the Act, because the provisions relevant to this action do not differ materially from those that were in effect when the Final Order was issued.

[4] The royalty payment would amount to one-eighth of their pro rata share of the value of the hydrocarbons in the pool, based on their acreage compared to the total acreage of the land overlying the pool, *See Fugate Aff.* Ex.10 at 166:9-14, Dkt. 24-5 ("Hearing Transcript"); 58 C.J.S. Mines and Minerals § 368 ("A 'royalty' is the landowner's share of oil and gas production, free of expenses of production.").

On December 7, 2016, Plaintiffs and several other mineral interest owners filed a

written objection to the application through their attorney. *Fugate Aff.* Ex. 3, Dkt. 24-5.

The objectors included members of Citizens Allied for Integrity and Accountability, Inc.

("CAIA"), one of the plaintiffs in this case. *Fugate Aff.* Ex. 11 at 19, Dkt. 24-5. CAIA is

an Idaho non-profit corporation whose members include landowners with property that

was subject to Alta Mesa's integration order, and brought suit in its associative

representative capacity on behalf of those members. *Compl.* ¶ 2; *Ans.* ¶¶ 3-4.

The December 14 hearing, which continued into December 15, was led by a

hearing officer and attended by Defendant Schultz, who was at that time the IDL

Director. *Hearing Transcript* at 7:12-17, 294:12-13, Dkt. 24-5. Plaintiffs' attorney

participated on behalf of Plaintiffs and several other uncommitted landowners who

opposed the integration application. *Id.* at 9:23-10:5. The parties had the opportunity to

present opening and closing statements, present evidence, and cross-examine witnesses.

*See generally Hearing Transcript*, Dkt. 24-5.

However, the hearing officer did not allow Plaintiff's attorney to elicit testimony

or introduce evidence on several subjects. For example, she sustained objections to

questions on the following subjects on the grounds of relevance: potential groundwater

contamination, effects of drilling operations on property values, and effects on noise

levels from drilling operations. *Id.* at 247:8-21, 248:8-12, 249:4-10. She also declined to

direct a witness to answer a question regarding lease modifications made for landowners

who had voluntarily leased their mineral rights, and sustained an objection to an inquiry

into whether horizontal drilling or hydraulic fracturing is a factor that should be taken into account in deciding the terms of a lease. *Id.* at 174:24-175:6, 190:14-25. At several points, the hearing officer indicated that certain subjects were not relevant to the determination of just and reasonable terms. *See, e.g.*, *Hearing Transcript* at 209:3-13, Dkt. 24-5 (stating "I don't see how it goes to just and reasonable" in regard to a question of Plaintiff's attorney related to bonus payments); *id.* at 160:21-25 (stating "I don't think that asking about projections on costs and potential recovery is probably going to be helpful in terms of determining whether or not the terms of the lease are fair and reasonable"). However, at no point during the hearing did she specify what factors, if any, she *did* view as relevant to a determination of "just and reasonable" terms.

Defendant Schultz issued an order on January 23, 2017.[5] *Director's Order*, Dkt. 24-5 ("Director's Order"). The Director's Order granted a temporary, 18-month spacing unit and integrated it for the same period of time.[6] *Id.* at 21-22. It also provided the statutorily-required options for participation by integrated landowners, and gave the landowners 30 days from the date of the order to choose one and make their selection known to Alta Mesa. *Id.* at 24-26. The order determined that the terms and conditions of the proposed spacing and integration orders were just and reasonable. The order made the following observations in making that determination:

---

[5] This order was the amended form of one that had been issued on January 17, 2017. *Director's Order* at 1, Dkt. 24-5. The change to the original order merely consisted of a corrected clerical error. *Id.*

[6] Defendants' counsel indicated at oral argument that the order was recently extended for another 18 months under the same terms and conditions.

The five alternatives for the uncommitted mineral interest owners to participate in the spacing unit are just and reasonable. The Applicant's proposed lease form contains just and reasonable terms to govern the relationship between the Applicants and uncommitted mineral interest owners who lease, fail to make an election, or choose to be objectors. The joint operating agreement with its revised terms contains just and reasonable terms to govern the relationship between the Applicants and the uncommitted mineral interest owners who elect to participate as working interest owners or nonconsenting working interest owners. As Mr. Pepper testified, the terms of the proposed lease and the joint operating agreement are reasonable and are standard in the industry throughout the greater geographic region.

*Id.* at 21.

Given that the drilling of these proposed wells are speculative exploratory wells entailing a higher degree of risk; and the significant distance of the well sites from well service contractors and the significant mobilization costs for transporting a drill rig, a 300% risk penalty is just and reasonable. Thus, the Applicant shall be entitled to recover from the interest of any nonconsenting working interest owner three hundred percent (300%) of the nonconsenting working interest owner's share of the cost of drilling and operating the well.

*Id.* at 22.

Plaintiffs appealed the Director's Order to the Idaho Oil and Gas Conservation Commission[7] ("the Commission"), and an appeal hearing was held on March 1, 2017. *Fugate Aff.* Ex. 9, Dkt. 24-5. However, on March 8, 2017, the Commission issued a final order ("Final Order") affirming and adopting the Director's Order. *Fugate Aff.* Ex. 7, Dkt. 24-5 ("Final Order"). Plaintiffs Holtry and Quade did not make an election for participation, and thus were "deemed leased." *Id.* Ex. 12 at 10, Dkt. 24-5; *id.* Ex. 13 at 9-

---

[7] Defendants Chris Beck, Margaret Chipman, Sid Cellan, Jim Classen, and Ken Smith made up the Idaho Oil and Gas Commission at all times relevant to this action. *Compl.* ¶ 6; *Ans.* ¶ 6.

10, Dkt. 24-5. Therefore, they would be entitled to receive a one-eighth royalty, a $100 per net mineral acre bonus payment, and a $100 bonus for an extension of the lease term. *Director's Order* at 26, Dkt. 24-5.

Plaintiffs filed a complaint in this Court on June 21, 2017.[8] (Dkt. 1.) In their complaint, Plaintiffs challenged the Final Order under 42 U.S.C. § 1983, which provides a remedy to individuals whose federal constitutional rights have been violated under the color of state law. *Compl.* ¶ 6; *Burke v. Cty. of Alameda*, 586 F.3d 725, 731 (9th Cir. 2009). Specifically, Plaintiffs argued that Defendants violated their due process rights[9] under the Fifth and Fourteenth Amendments by failing to provide a meaningful opportunity to oppose the integration application. *Compl.* ¶¶ 22-24. Plaintiffs seek summary judgment on all of their claims except as to whether and to what extent they are entitled to financial damages. *Pl's Br.* at 23, Dkt. 23-1. Defendants seek summary judgment against Plaintiffs as to all of Plaintiffs' claims. *Def's Br.* at 21, Dkt. 24-1.

_____

[8] Defendants note that Plaintiffs never filed a petition for judicial review of the Final Order under the Idaho Administrative Procedure Act in state district court pursuant to Idaho Code §§ 67-5270 and 67-5272. *Def's Statement of Undisputed Facts* ¶ 36, Dkt. 24-2; *Fugate Aff.* Ex. 7 at 2, Dkt. 24-5 ("Final Order"). However, Plaintiffs were not required to do so before bringing a § 1983 action in this Court. *See Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 516 (1982) (holding that § 1983 plaintiffs are not required to exhaust state remedies).

[9] Plaintiffs originally brought several claims that they have since withdrawn, including equal protection, substantive due process, and arbitrary and capricious claims. Plaintiffs discontinued their equal protection claim in their response brief and stated at oral argument that their due process claim was an "as applied" rather than a facial challenge to the OGCA. *Pl's Resp.* at 10-11, Dkt. 30. Therefore, in this order, the Court will only consider Plaintiffs' procedural due process claims and corresponding forms of requested relief.

# LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

When cross-motions for summary judgment are filed, the Court must independently search the record for factual disputes. *Fair Housing Council of Riverside*

*County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The filing of cross-

motions for summary judgment – where both parties essentially assert that there are no

material factual disputes – does not vitiate the court's responsibility to determine whether

disputes as to material fact are present. *Id.*

## ANALYSIS

### 1.     Defendants' Motion for Summary Judgment

#### A.     Jurisdiction

Defendants argue that the Court lacks jurisdiction over Plaintiffs' claims because a

question of state law underlies Plaintiffs' due process claims. *Def.'s Br.* at 20, Dkt. 24-1.

Specifically, they contend that because Plaintiffs allege that they were not allowed to

present evidence of "just and reasonable" terms, and the scope of "just and reasonable"

terms is a question of state law, Plaintiffs' claims are not cognizable under § 1983.[10] *Id.*

Defendants are correct that the scope of "just and reasonable" is a question of state

law, because the term was created by a state statute: the OGCA. However, it does not

follow that this Court lacks jurisdiction to hear Plaintiffs' due process challenge under the

federal Constitution. Federal due process requirements define the minimum level of

process that states must provide, regardless of state procedures. *See Cleveland Bd. of

Educ. v. Loudermill*, 470 U.S. 532, 541 (1985) ("[O]nce it is determined that the Due

_____

[10] Defendants also argue that this Court lacks supplemental jurisdiction over any alleged
violations of state law because Plaintiffs failed to petition for judicial review of the Final Order within 28
days of its issuance, as required by Idaho Code § 67-5273(2). *Def.'s Br.* at 20, Dkt. 24-1. However,
because Plaintiffs have not alleged any violations of state law, this argument is moot.

Process Clause applies, the question remains what process is due . . . [t]he answer to that question is not to be found in the [state] statute."); *Voigt v. Savell*, 70 F.3d 1552, 1563 (9th Cir. 1995) ("What procedures are constitutionally required if the state seeks to deprive the defendant of a protected interest is determined by federal law.") (citations omitted). Thus, the Court has jurisdiction to evaluate Plaintiff's due process claims even though the scope and meaning of "just and reasonable" is a question of state law.

### B.     Standing

AM Idaho, LLC ("AM") filed an *amicus curiae* brief (Dkt. 29) in which it argues that Plaintiffs lack standing because they failed to establish that inadequate process caused them any actual or likely harm. *Amicus Br.* at 2, Dkt. 29. In support of this argument, AM pointed to evidence purportedly showing the weaknesses of Plaintiffs' claims that drilling could negatively impact their property and health, such as the testimony of AM's senior landman that publicity about oil and gas had no impact on home values in the areas being considered for drilling. *Id.* at 2-6. However, procedural due process violations, in and of themselves, constitute harm sufficient to confer standing *See Vietnam Veterans of Am. v. C.I.A.*, 288 F.R.D. 192, 209–10 (N.D. Cal. 2012) ("The Supreme Court has held that the denial of procedural due process is an injury in its own right, 'does not depend on the merits of the claimant's substantive assertions,' and is actionable even without proof of other injury," quoting *Carey v. Piphus,* 435 U.S. 247, 266 (1978)).

AM also argues that "the entirely speculative nature of the risk of harm asserted by Plaintiffs renders their claims unripe." *Amicus Br.* at 6, Dkt. 29. Again, however, procedural due process violations are a harm in and of themselves, and thus the harm that Plaintiffs assert is not "speculative"; it has already happened. Additionally, as discussed below, the damage is ongoing because Final Order still in effect.

For the foregoing reasons, the Court finds that Plaintiffs have standing to bring their due process claims, and their claims are ripe for adjudication.

## C.    Due Process

"[T]he Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). It applies to the states through the Fourteenth Amendment. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.'")

To establish a due process violation, a plaintiff must first show that he or she had a protected property interest under the Due Process Clause, and must then establish that he or she was deprived of the property without receiving the process that he or she was constitutionally due. *Levine,* 525 F .3d at 905 (*citing Clements v. Airport Authority of Washoe Cnty.,* 69 F.3d 321, 331 (9th Cir.1995)). Courts evaluate whether a plaintiff has satisfied the second part of this test using the three-part balancing test of *Mathews v.*

*Eldridge*: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. 319, 335 (1976).

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* at 333. However, "due process is flexible and calls for such procedural protections as the particular situation demands," and "must be tailored to the capacities and circumstances of those who are to be heard." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972); *Goldberg v. Kelly*, 397 U.S. 254, 268–69 (1970).

### (1) Protected Property Interest

Protected property interests do not from the Constitution, but rather from "an independent source such as state law." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). Because the development of oil and gas rights provides important context for understanding the nature of Plaintiffs' property rights as defined by Idaho law, the Court provides a brief overview of that development below.

Historically, underground oil and gas extraction was governed by the common law rule of capture in almost all jurisdictions. *The Law of Pooling and Unitization*, 3rd Edition § 2.01 (2017). Under the rule of capture, a landowner with property overlaying an

underground oil or gas pool could drill a well on his or her land and would own all of the oil or gas that he or she brought to the surface, without limit. *Id.* Unfortunately for neighboring landowners with property overlying the pool, the "fugacious" nature of oil and gas meant such a landowner could extract oil and gas not only from under his or her own property, but also from theirs, and would be under no obligation to share his or her profits with them. *Id.* The only remedy that other landowners had would be to drill their own wells and try to extract as much oil and gas as they could before the pool was dry. *Id.*

To prevent the kind of wasteful extraction and harm to neighboring landowners that this kind of "race to the bottom" caused, state legislatures adopted conservation laws that modified the rule of capture. *Id.* Under these laws, landowners no longer have an absolute right to all the oil they can bring to the surface. *Id.* Rather, they have "correlative rights," defined in Idaho as "the opportunity of each owner in a pool to produce his just and equitable share of oil and gas in a pool without waste." *Id.*; Idaho Code § 47-310(4). To accomplish the goals of protecting correlative rights and preventing waste, these laws direct state oil and gas agencies to regulate the spacing of oil wells and approve both voluntary and involuntary "pooling" (or "integration") of ownership rights through integration orders. Frank Sylvester, Robert W. Malmsheimer, *Oil and Gas Spacing and Forced Pooling Requirements: How States Balance Energy Development and Landowner Rights*, 40 U. Dayton L. Rev. 47, 49-50 (2015). Landowners whose mineral rights have

been integrated are entitled to share in the value of the oil and gas production on fair and reasonable terms. *Id.* at 50.

In Idaho, integrated landowners are given several options for participation in oil and gas production, with varying levels of risk and reward. *See* Idaho Code § 47-320. "Deemed leased" landowners like Plaintiffs Quade and Holtry are each entitled to a one-eighth royalty and a bonus payment set at "the highest bonus payment per acre that the operator paid to another owner in the spacing unit prior to the filing of the integration application." All landowners, regardless of the option chosen, are entitled to have integration orders "be upon terms and conditions that are just and reasonable." *Id.* Thus, while Plaintiffs do not have an absolute property right in the oil and gas beneath their land, they do each have a protected property interest in a reasonable share of the oil and gas production, as determined by the Idaho Legislature. "Property consists in a bundle of rights." *Mishler v. Nevada State Bd. of Med. Examiners*, 896 F.2d 408, 410 (9th Cir. 1990). The Idaho Legislature has decided that for landowners with property overlying a pool of hydrocarbons, that "bundle" consists not only of a royalty and bonus payment, but also "just and reasonable" terms and conditions. *See* Idaho Code § 47-320. For Plaintiffs, as "deemed leased" landowners in an integrated unit where the highest bonus payment paid by the operator prior to filing the application was $100, that means: (1) a one-eighth royalty, (2) a $100 bonus payment, and (3) "just and reasonable" terms and conditions. *See id.*; *Director's Order* at 26, Dkt. 24-5.

During the hearing, Defendants suggested that Plaintiffs' interest in "just and reasonable" terms is not a protected property interest because the determination of whether the terms are "just and reasonable" lies within the discretion of the hearing officer. It is true that "[a] benefit is not a protected entitlement if officials have discretion to grant or deny it." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 748 (2005). However, even assuming that just and reasonable terms constitute a "benefit" for due process purposes, they are not discretionary. The OGCA, by its own terms, prevents hearing officers from approving an integration order that does not contain just and reasonable terms. *See* Idaho Code § 47-320 (Each such integration order *shall* be upon terms and conditions that are just and reasonable.") (emphasis added). In other words, the Commission has a significant amount of discretion to decide what "just and reasonable" means, but not so much discretion that they can decide it means nothing. *See United States v. LSL Biotechnologies*, 379 F.3d 672, 679 (9th Cir. 2004) (stating that courts "strive to avoid constructions that render words meaningless").

Therefore, because the inclusion of just and reasonable terms is not discretionary, Plaintiffs have a protected property interest not only in the royalty and bonus payment, but also in just and reasonable terms and conditions.

### (2)    Process Due

Because Plaintiffs have a protected property interest in a one-eighth royalty, $100 bonus payment, and just and reasonable terms, they cannot be deprived of them except pursuant to constitutionally adequate procedures. *See Loudermill*, 470 U.S. at 541. It is undisputed that Plaintiffs were not deprived of the royalty and bonus payment – they are written into the statute and cannot be lowered by the IDL Director or the Commission.[11] However, Plaintiffs argue that they were deprived of "just and reasonable" terms without adequate process because "the hearing provided was not meaningful, and the standards applied were not reasonably ascertainable." *Pl's Br.* at 18, Dkt. 23-1. Defendants counter that the hearing complied with all procedural due process requirements, and the hearing officer was authorized to exclude irrelevant evidence under Idaho Code § 67-5251. *Def's Br.* at 15, Dkt. 24-1.

As explained above, Plaintiffs' property right included "just and reasonable" terms. The Court must therefore apply the *Mathews* test to determine whether Plaintiffs received a meaningful opportunity to be heard on the issue of whether the integration order contained terms that were just and reasonable. Regarding the first *Mathews* factor,

---

[11] In their complaint and in some sections of their summary judgment briefs, Plaintiffs suggest that Defendants had the authority to alter the amount of compensation given to Plaintiffs and improperly refused to consider factors that could affect the level of fair compensation. *See, e.g.*, *Compl.* ¶ 1 ("Plaintiff landowners bring suit to challenge a decision of the Idaho Oil and Gas Conservation Commission which compelled landowners to "pool" their natural gas resources and allow a private corporation to drill for, capture and sell their valuable assets against their will, at **prices** they did not agree to, and without providing them adequate due process of law.") (emphasis added). However, Plaintiffs' attorney conceded at the hearing that consideration of "just and reasonable" terms does not include the compensation rate. (Continued)

Plaintiffs' interest in the order is relatively modest. As explained above, most of their property interest—the royalty rate and bonus payment—is guaranteed and unalterable.

The second *Mathews* factor weighs more heavily in favor of Plaintiffs. Plaintiffs faced a high risk of erroneous deprivation of their interest in just and reasonable terms because the hearing officer did not adequately explain the basis on which she determined that the terms of the integration order were just and reasonable.[12] "Due process requires the opportunity to be heard in a "meaningful manner," and "[t]he opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard. *Mathews*, 424 U.S. at 335; *Goldberg*, 397 U.S. at 268-69.

The Director's Order failed to meet these minimum due process requirements. It stated that the terms of the integration order were just and reasonable because the terms of the proposed lease and JOA were "reasonable and standard in the industry throughout the greater geographic region." *Director's Order* at 21-22, Dkt. 24-5. In part, this statement shows circular reasoning by suggesting that the terms are "just and reasonable" because they are reasonable. The statement that the terms were "standard in the industry throughout the greater geographic region," on the other hand, may be a valid reason to

_____

[12] Plaintiffs also argued that Defendants violated procedural due process in other ways, such as the use of "biased decision makers" and an "unrealistic time frame" for Plaintiffs to prepare for the hearing. *Pl's Resp.* at 10, Dkt. 30. The Court need not address these arguments because it is remanding the matter to the Commission for a new hearing.
(Continued)

find the terms to be just and reasonable.[13] However, Plaintiffs were not granted a meaningful opportunity to be heard on this issue.

At no point in the December hearing did the hearing officer indicate that her decision on whether the integration order's terms were just and reasonable would be based on standards used in the industry and in the greater geographic reason. Neither did the Commissioners do so in the March 8 hearing. The notice of hearing also lacked any mention of this. As a result, there was no way for Plaintiffs to know what evidence would be relevant to the hearing officer's decision. If the standards to be used in the hearing officer's decision had been clear, Plaintiffs could have focused their arguments on those factors that would actually affect the determination of "just and reasonable" terms.[14] Because this was not clearly spelled out, Plaintiffs were deprived of a meaningful opportunity to be heard.

_____

[13] One recent decision from the Utah Supreme Court suggests that it is. See *J.P. Furlong Co. v. Bd. of Oil, Gas & Mining*, No. 20150620, 2018 WL 2710963, at *5-6 (Utah June 5, 2018) (concluding that there was substantial evidence to support the state oil and gas board's decision that a JOA was just and reasonable similar JOAs were previously deemed just and reasonable and the terms were based on a standard industry form). However, even assuming that this reasoning applies under a due process rather than substantial evidence standard, and that the and gas conservation statutes of Utah and Idaho are similar enough for comparison, Defense counsel at oral argument suggested that it would be difficult to craft rules to govern determination of just and reasonable terms because site-specific factors have to be considered, suggesting that simply relying on an industry-wide standard over a large geographic area might be an insufficient basis for determining that terms are just and reasonable.

[14] The Court cannot know for certain what these factors are, because Defendants have not listed them. However, the record shows at least some factors could qualify because they are unrelated to compensation but could affect the terms and conditions of the integration order. For example, if a hearing officer determined that it was needed to ensure just and reasonable terms, the hearing officer could presumably alter the length or the primary term or extension of the lease, which party pays for the cost of transporting the natural gas, and whether the lease includes the right of ingress and egress over the landowner's property. *Hearing Transcript* at 62:1-15, Dkt. 24-5; *id.* at 198:19-199:5; *id.* at 193:4-18.

Plaintiffs' particular "capacities and circumstances" further support the conclusion that the hearing failed to satisfy due process. Integration applications like the ones at issue here are relatively new in Idaho, and the term "just and reasonable" has not been interpreted by the Idaho Supreme Court. *See Pl's Br.* at 2, Dkt. 23-1 ("As hydrocarbon development is new to Idaho, [the December 14-15 hearing] was the first hearing under the new law."); *Hearing Transcript* at 113:23-114:7, Dkt. 24-5 (hearing officer stating "we are inventing the wheel" and "we are all sort of doing some of these things for the first time and getting a feel for these new regulations, also setting precedents for hearings to come"); *Def.'s Br.* at 15, Dkt. 24-1 ("The Idaho Supreme Court has not interpreted the term "just and reasonable" as it appears in the Act."). As private citizens who are not experts in the complex and specialized field of oil and gas law, Plaintiffs were especially disadvantaged by the lack of precedent to inform their understanding of what factors may be considered in a determination of "just and reasonable" terms. Therefore, Plaintiffs' capacities and circumstances support a finding that here, due process required a clear explanation of the factors considered in applying the "just and reasonable" standard.

As to the third *Mathews* factor, holding a new hearing will impose relatively few financial or administrative costs on Defendants. The hearing will involve the same issues, parties, and facts that the previous one did. The only change required will be specification of the basis on which Defendants determine factors to be relevant or irrelevant to the determination of "just and reasonable" terms. Additionally, Defendants have an interest

in ensuring that the integration hearing complies with due process in order to set an example for future hearings and thereby reduce the probability of further litigation.[15]

This conclusion does not affect the hearing officers' ability to exclude irrelevant or unnecessary testimony or evidence, or the Commission's discretion to determine what factors should be considered when determining whether the terms and conditions of integration order are "just and reasonable." Rather, it simply recognizes that due process requires a meaningful opportunity to be heard, and in these circumstances, that Plaintiffs and other nonconsenting landowners know the standard which the hearing officer will apply in considering whether the integration order is just and reasonable.

This is a close case. Plaintiffs were provided with a hearing and an opportunity to be heard, and the hearing officer provided a reason for her decision. However, the lack of any explanation as to what would guide the decision of whether the terms of the integration order were just and reasonable meant that Plaintiffs' opportunity to be heard was not "meaningful," as required to satisfy due process.

### D.     Eleventh Amendment and Monetary Damages

Defendants argue that Plaintiffs are precluded from seeking monetary damages. *Def.'s Br.* at 20-21, Dkt. 24-1. The Court agrees. As a general rule, a plaintiff may not

---

[15] The Court encourages the Commission to revise its regulations by listing the factors to be considered when determining whether the terms of integration order are just and reasonable, in order to ensure consistency of the standards used in decision making and make those standards clear to the public. (Continued)

bring a § 1983 claim[16] against state officials acting in their official capacities, because

such officials are not considered "persons" under § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). However, the Supreme Court created an exception

to this rule in *Ex parte Young*, 209 U.S. 123, 159–160 (1908), by allowing suits against

state officials acting in their official capacities "for prospective declaratory or injunctive

relief" to redress an "ongoing violation of the Constitution or federal law." *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943 (9th Cir. 2013);

*Cardenas v. Anzai*, 311 F.3d 929, 935 (9th Cir. 2002).

Though Plaintiffs do not cite to this exception in their complaint or briefs, the fact

that they seek summary judgment only on the issue of injunctive and declaratory relief,

and not monetary relief, suggests their understanding that the *Ex parte Young* doctrine

applies here. *See Compl.* ¶ 24 (seeking declaratory relief, permanent injunctive relief, fees

and costs, and "such other and further relief as the Court deems just and proper"); *Pl's Br.* at 16, Dkt. 23-1 (conceding that there are disputed issues of material fact as to

financial damages). Additionally, Defendants' due process violation is ongoing because

the Final Order is still in effect and Defendants have not revised their regulations or

otherwise signaled an intent to more clearly explain the standards governing

---

[16] Because bring their due process claims under § 1983, the Court need not analyze whether the State of Idaho has waived its Eleventh Amendment immunity for claims brought under the OGCA. *See Spaulding v. Univ. of Washington,* 740 F.2d 686, 694 (9th Cir.1984) ("The eleventh amendment to the Constitution bars suit in federal court by citizens against a state or its agency [or state officials acting in their official capacities] under section 1983 [subject to the *Ex parte Young* exception] unless the state has waived its immunity."), *overruled on other grounds by Atonio v. Wards Cove Packing Co.,* 810 F.2d 1477 (9th Cir.1987)).

determination of just and reasonable terms in the future. *See Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (suit for injunctive relief preventing state officials from enforcing an order that contravenes federal law "clearly satisfies" requirements for *Ex parte Young* exception). Therefore, the Court will grant summary judgment to Defendants on the issue of money damages, but will allow Plaintiffs to seek prospective declaratory and injunctive relief under the *Ex parte Young* doctrine.

**2.    Plaintiffs' Motion for Partial Summary Judgment**

    **A.    *Due Process Claim***

Plaintiffs moved for partial summary judgment on all of their claims except as to the issue of financial damages. For the reasons discussed above, the Court will grant Plaintiff's motion.

**ORDER**

**IT IS ORDERED:**

1.    Defendants' Motion for Summary Judgment (Dkt. 24) is **GRANTED IN PART AND DENIED IN PART** as follows:

    a.  As to Plaintiffs' claim for financial damages, the motion is **GRANTED**.

    b.  In all other respects, the motion is **DENIED**.

2.    Plaintiffs' Motion for Partial Summary Judgment (Dkt. 23) is **GRANTED**.

3.    The Commission is instructed to vacate the Final Order, rescind the lease contracts of Plaintiffs Quade and Holtry, and hold a new hearing that

complies with due process by explaining the factors that will be considered when determining whether the terms and conditions of an integration order are "just and reasonable."

DATED: August 13, 2018

B. Lynn Winmill
Chief U.S. District Court Judge